IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LESLIE S. RICH,                          :

     Plaintiff,                          :

v.                                       :          Civil Action No. GLR-17-2026

WILLIAM PENN LIFE INSURANCE              :
COMPANY OF NEW YORK,
                                         :
     Defendant.

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant William Penn Life Insurance Company of New York's ("William Penn") Partial Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 38).[1] Plaintiff Lesley S. Rich, trustee for the Richard S. Wallberg Insurance Trust (the "Trust"), brings this putative class action against William Penn for breach of contract and fraud in connection with certain universal life insurance policies that the Trust and putative class members purchased. The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons outlined below, the Court will grant in part and deny in part the Motion.

---

[1] Also pending before the Court is William Penn's Motion to Dismiss (ECF No. 30) the Complaint. In response, Plaintiff Leslie S. Rich filed an Amended Complaint on October 20, 2017. (ECF No. 35). When a plaintiff files an amended complaint, it generally moots any pending motions to dismiss because the original complaint is superseded. Venable v. Pritzker, No. GLR-13-1867, 2014 WL 2452705, at *5 (D.Md. May 30, 2014), aff'd, 610 F.App'x 341 (4th Cir. 2015). Accordingly, the Court will deny the Motion as moot.

# I.    BACKGROUND[2]

## A.    The Class Policies

Rich is the trustee of the Trust, a trust organized under New York law. (1st Class Action Am. Compl. ["Am. Compl."] ¶ 1, ECF No. 35). The Trust is the designated owner of a Longevity UL 100 life insurance policy, one of the Class Policies discussed below, that Rich purchased in 2001 for the benefit of his son. (Id. ¶ 14). William Penn is a for-profit life insurer organized under New York law and headquartered in Frederick, Maryland. (Id. ¶ 1). William Penn's corporate parent is Banner Life Insurance Company ("Banner"), a for-profit life insurer organized under Maryland law. (Id.). Banner is wholly owned by Legal and General America, Inc. ("LGA"). (Id.). LGA is wholly controlled by Legal and General Group Plc ("L & G"), a United Kingdom company. (Id.).

William Penn issues certain universal class policies: (1) Longevity UL 100; (2) Penn UL; (3) Life Umbrella UL 120; and (4) Advantra (collectively, the "Class Policies"). The Class Policies differed from regular life insurance policies. (Id. ¶ 23). Regular policies expire or "lapse" if the cash value of the policy is insufficient to cover the policy's insurance charges and other expenses. (Id.). One such expense is the cost of insurance ("COI") fee, which William Penn deducts monthly from the account value of each life insurance policy, including the Class Policies. (Id. ¶¶ 27–28). Unlike regular life insurance policies, the Class Policies were "no-lapse-guarantee" policies, meaning

---
[2] Unless otherwise noted, the Court takes the following facts from Rich's Amended Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

the Class Policies were guaranteed to stay in force for a certain period if the policyholders paid the minimum monthly premium. (Id. ¶¶ 22–23). Accordingly, the Class Policies would not lapse at any time during the guaranteed period, even if their cash values—the portion of the premiums policyholders paid that exceeded the Class Policies' costs—were negative. (Id. ¶ 23).

Rich's specific policy featured a $500,000.00 death benefit with a ten-year no-lapse-guarantee, as long as Rich paid the minimum premium. (Id. ¶¶ 22–23). Policyholders could also choose to pay more than the required minimum premium, and these excess premiums increased the Class Policies' cash value. (Id. ¶ 57). Rich paid both its minimum required premiums and excess premiums throughout the course of the policy. (Id. ¶¶ 25, 289). Interest accrued at a rate of 4% on the account values of the Class Policies. (Id. ¶¶ 24, 40).

On July 15, 2015, Rich and the putative class members received a letter from William Penn informing them that the monthly COI rate would increase in August 2015 (the "COI Notification Letter"). (Id. ¶ 27). The COI rate increased dramatically over the next year. (Id. ¶¶ 29, 31). In August 2015, Rich paid a COI rate of $317.88 per month, and the policy's account value was $34,798.22. (Id. ¶ 28). In September 2015, Rich paid a COI rate of $342.31 per month. (Id. ¶ 31). The COI rate continued to rise, increasing to $555.39 in February 2016 and to $620.72 in November 2016. (Id.). With these increases, the COI fee began to exceed the minimum premium amount. (Id. ¶ 32). Accordingly, the deduction of the COI fee will soon drain the cash value of the policy entirely so that there will be insufficient cash value to fund the policy beyond the

guaranteed ten-year period.  (Id.).  As of November 2016, the policy value had dropped to $29,455.67.  (Id.).

Under the terms of the Class Policies, any COI rate changes must be "based on the Company's expectations as to future mortality, persistency, expenses and investment earnings."  (Am. Compl. Ex. 2 ["Class Policies"] at 11, ECF No. 35-2).  The Class Policies explicitly prohibit COI rate changes based on William Penn's "past experience." (Id.).  The COI Notification Letter stated that, in accordance with the terms of the Class Policies, William Penn increased the monthly COI rate "based on [its] expectations of the future cost of providing this coverage."  (Am. Compl. Ex. 4 ["COI Letter"] at 11, ECF No. 35-2).  In addition, before the COI increase, William Penn represented that it was a "well-funded company, operating efficiently, increasing profits and cash flows, and reducing costs" in its corporate annual reports and on its website. (Am. Compl. ¶ 279). William Penn also "made material representations and omissions regarding the pricing model and the policies performance" in its annual policy statements ("Policy Statements") through 2015.  (Id. ¶ 280).

B.    **The Captive and Affiliate Reinsurance Scheme**

Rich alleges the reason provided by William Penn for the COI rate increase is specious.  (Id. ¶ 35).  According to Rich, William Penn's financial instability was the real reason for the increase.  (Id.).  Rich contends William Penn has been concealing its financial instability through "a captive and affiliate reinsurance scheme." (Id.).  Rich maintains that William Penn impermissibly increased COI rates based on past experience

"to appear financially sound."  (Id.).  The Amended Complaint's description of this scheme is immensely detailed and is briefly summarized here.

Because it is unlikely that a life insurance policy will have to pay out all death benefits for which it is obligated at the same time, life insurance companies are required to hold only a certain portion of their total contractual obligations in reserves.  (Id. ¶ 147). In 2000, lawmakers enacted Regulation XXX, significantly increasing reserve requirements for life insurers.  (Id. ¶ 162).  In response, insurance companies began using reinsurance schemes to work around the reserve requirements.  (Id. ¶¶ 164–65).  In a reinsurance transaction, one company, the ceding company, cedes a block of life insurance policies to another company, the assuming company or the reinsurer. (Id. ¶ 145).  The assuming company then becomes responsible for paying the liabilities of the ceded block of policies; the ceding company is no longer responsible for the liabilities.  (Id.).  The transaction allows the ceding company to drop the liabilities of the block of policies from its financial statements and improve its surplus.  (Id.).

When the reinsurer is financially solvent and highly capitalized, reinsurance transactions can help a ceding company legitimately spread risk.  (Id. ¶ 152).  Problems arise, however, when the reinsurer is an undercapitalized, wholly owned company of the ceding company.  (See id. ¶ 155).  In such transactions, known as "captive or affiliate transactions," the ceding company does not actually accomplish the valid purpose of spreading risk because the company has simply ceded its liabilities to an affiliated, undercapitalized company.  (Id. ¶ 155).  As a result, the ceding company is still ultimately responsible for the liabilities.  (Id.).  Put another way, "pretending to transfer

risk to an affiliate or captive is similar to a husband handing off a debt he owes a bank to his wife, purportedly to improve the family's financial condition. It simply does nothing." (Id. ¶ 156).

William Penn engaged in several captive reinsurance transactions. (Id. ¶ 183). Although Rich acknowledges the transactions were legal, Rich alleges William Penn has used these transactions to make it appear financially stable and to inflate its statutory surplus. (Id.). Through these transactions, William Penn "misstate[d] its true surplus, and mask[ed] its troubled financial condition to regulators, rating agencies, and ultimately, its life insurance customers." (Id.). They "allowed William Penn to misrepresent [its] financial health by hiding liabilities and inflating assets, thereby improving [its] risk profile and reducing the amount of cash reserves [it was] required to maintain." (Id. ¶ 203).

## C.  The COI Increase

Although William Penn appeared to be financially stable on paper because of these captive reinsurance transactions, it had been facing financial difficulties for some time. (Id. ¶ 52). After the Great Recession, William Penn was suffering financially because of poor investment performance and low interest rates. (Id. ¶ 204). On January 15, 2013, LGA, Banner, and William Penn released an agency communication stating, "We are experiencing an investment environment where even the guaranteed minimum interest rate on some in-force policies cannot be achieved with new investments." (Id. ¶ 54). William Penn knew since at least the time of this agency communication that the COI fees would not adequately account for future experience, but did not raise the

rates at that point. (Id. ¶ 57). Instead, "it chose to lull policyholders into a false belief that their policies were performing adequately and that they should continue to pay excess premiums and build the polices' cash values." (Id.). During this time period, analysts also released reports noting the financial problems life insurers would face because interest rates were too low and captive reinsurance transactions were inflating surpluses. (Id. ¶¶ 204–06).

Despite its financial problems, William Penn continued to misrepresent itself as financially stable in its Policy Statements, in its corporate annual reports ("Corporate Reports"), and on its website. (Id. ¶¶ 279–80). "In fact, every public representation William Penn, Banner, LGA, or L&G made indicated . . . that the companies were performing strongly, reducing costs, and outperforming the market." (Id. ¶ 47). Rich and the putative class members "relied upon these statements, as indicated by their continuing to pay premiums." (Id.).

When William Penn finally did decide to raise COI rates, the increase was an attempt to recoup prior losses. (Id. ¶ 59). In an agency communication on July 14, 2015, one day before the COI Notification Letter was sent to Rich and the putative class members announcing the COI rate increase, the companies stated they were experiencing "significantly eroded profitability." (Id. ¶ 52). The agency communication explained:

> Investment returns have been at all-time lows **for an extended period of time** making it impossible to earn the investment income assumed in pricing.

> Credited interest rates have been much lower than those reasonably assumed in pricing, **at times decades ago**, resulting in lower cash values and less interest margin.

(Id. ¶ 53).  The agency communication went on to state that, contrary to the reason it gave policyholders in the COI Notification Letter, William Penn was increasing COI rates in an "attempt to restore profitability in the future."  (Id. ¶ 65).

These agency communications and the analyst reports demonstrate that William Penn knew it had been losing money on the policies at issue for years.  (Id. ¶¶ 204–06). William Penn, therefore, knew the COI rate would need to be increased to recoup its losses.  (Id. ¶ 58).  Despite this knowledge, William Penn never notified policyholders of these problems, and it continued to misrepresent itself as financially stable.  (Id.).  In reliance on its misrepresentations, policyholders continued to pay their premiums and excess premiums and refrained from obtaining alternative life insurance.  (Id. ¶ 60). During this time, "William Penn took no action regarding the Class Policies save to reduce the interest rates to the minimum guaranteed rate of 4% in 2010."  (Id. ¶ 207).

Five years after the Great Recession, on July 15, 2015, William Penn sent the COI Notification Letter to its policyholders.  (Id. ¶ 286; COI Letter).

D.    **Procedural History**

On July 20, 2017, Rich filed suit against William Penn on behalf of the Trust and putative class members.  (ECF No. 1).  William Penn moved to dismiss on September 29, 2017.  (ECF No. 30).  In response, Rich filed an Amended Complaint, alleging two causes of action based on the COI rate increase: (1) breach of contract (Count I) and (2) fraud (Count II).  (Am. Compl. ¶¶ 271–92).  Rich seeks compensatory and punitive

damages, restitution, declaratory and injunctive relief, and attorney's fees and costs.  (Id. at 80).

On November 13, 2017, William Penn filed a Partial Motion to Dismiss Plaintiff's First Amended Complaint.  (ECF No. 38).  Rich filed an Opposition on November 22, 2017.  (ECF No. 39).  On December 20, 2017, William Penn filed a Reply.  (ECF No. 42).

## II.    DISCUSSION

### A.    <u>Standard of Review</u>

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999)).  A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555).  Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element.  <u>Goss v.</u>

Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom., Goss v. Bank of Am., NA, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

In deciding a Rule 12(b)(6) motion, the court only considers the pleadings, documents attached to the complaint, and "documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed." Sposato v. First Mariner Bank, No. CCB-12-1569, 2013 WL 1308582, at *2 (D.Md. Mar. 28, 2013); see CACI Int'l v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154 (4th Cir. 2009); see also Fed.R.Civ.P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

## B.    Analysis

William Penn's Motion addresses Count II of Rich's Amended Complaint: fraud. William Penn raises five defenses: (1) Rich lacks standing; (2) the claim is barred by the statute of limitations; (3) the claim is barred by the source of duty rule; (4) the claim is

barred by the economic loss rule; and (5) Rich fails to state a claim for fraud. At bottom, the Court will not dismiss Count II of the Amended Complaint in its entirety. Instead, Rich may only proceed on his fraud claim with respect to the Policy Statements, Corporate Reports, and website.

### 1. Standing

Article III of the Constitution restricts the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const., Art. III, § 2. "[The] case-or-controversy requirement is satisfied only where a plaintiff has standing." Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 273 (2008). To establish constitutional standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.' Susan B. Anthony List v. Driehaus, 134 S.Ct. 2334, 2341 (2014) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)).

This Court, in the related case of Dickman v. Banner Life Insurance Co., found the plaintiffs had standing where they alleged similar facts. No. WMN-16-192, 2016 WL 7383869, at *9 (D.Md. Dec. 21, 2016). The Dickman plaintiffs alleged that, in reliance on defendant's misrepresentations about its financial condition, "they continued to make excess premium payments for which they received no benefit," establishing injury in fact. Id. They further alleged that if they had known that the defendant was in fact in financial distress, "they would not have continued to make those payments for as long as they did," which established causation. Id. Finally, this Court found that a decision in favor of the Dickman plaintiffs on the fraud claim would redress the injury "by the return of at least

the excess premiums paid after the point that Banner was aware that the inevitable increase in the COI would engulf those excess premiums." Id.

With regard to the injury-in-fact prong, Rich, like the Dickman plaintiffs, alleges that in reliance on William Penn's misrepresentations and omissions that it was financially stable, Rich and the putative class members "continued to pay premiums and excess premiums" and "did not attempt to obtain alternative life insurance policies at an earlier date." (Am. Compl. ¶ 289). Rich alleges a financial injury from continuing to pay premiums on the life insurance policy: Rich will soon lose all the cash value of the account because the COI rate began to exceed the minimum premium. (Id. ¶¶ 289–90). Additionally, Rich alleges that the Trust continued to pay excess premiums in reliance on William Penn's misrepresentations. (Id. ¶ 289). Thus, Rich has established an injury in fact.

Causation is established because if William Penn had disclosed its financially precarious position in its communications with Rich and the putative class members, Rich and the class members would not have continued to pay premiums and excess premiums. See Dickman, 2016 WL 7383869, at *9. With knowledge of William Penn's true financial condition, they would have known that paying excess premiums would have no value because the COI rate would begin to exceed the cash value of the account. (Am. Compl. ¶ 289). Like the Dickman plaintiffs, if Rich and the putative class members knew that the excess premiums would not extend the life of the Class Policies, they would not have continued to make such payments. (Id.). In addition, with accurate knowledge of William Penn's financial condition, Rich and the putative class members

would have sought alternative life insurance policies. (Id.). Thus, Rich establishes a sufficient causal connection between William Penn's alleged misstatements and omissions and the Trust's injuries. See Dickman, 2016 7383869, at *9.

Finally, like the Dickman plaintiffs, the return of the excess premiums paid after the point that William Penn knew that the "inevitable increase in the COI would engulf those excess premiums" would redress Rich's injury in this case. 2016 WL 7383869, at *9. A favorable decision for Rich and the putative class members, therefore, would compensate them for the financial losses they suffered, establishing the redressability prong. Id. The Court, therefore, concludes that Rich has standing.

## 2.    Statute of Limitations

Under New York law,[3] the statute of limitations for fraud claims is "the greater of six years from the date the cause of action accrued or two years from the time plaintiff discovers the fraud, or could with reasonable diligence have discovered it." Cusimano v. Schnurr, 27 N.Y.S.3d 135, 140 (N.Y.App.Div. 2016). The plaintiff discovers the fraud "when the plaintiff has knowledge of facts from which the fraud could be reasonably inferred." Id.

---

[3] Because this case arises under the Court's diversity jurisdiction the Court will apply federal procedural law and state substantive law. See Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co., 736 F.3d 255, 261 n.3 (4th Cir. 2013). For tort actions, Maryland courts apply the law of the place of injury. Johnson v. Oroweat Foods Co., 785 F.2d 503, 511 (4th Cir. 1986). "The place of injury is the place where the injury was suffered, not where the wrongful act took place." Id. The injury here was undisputedly suffered in New York, where the Trust is organized. (Am. Compl. ¶ 15). In addition, the parties agree that New York law applies to both Counts of the Amended Complaint. (See Def.'s Mem. L. Supp. ["Def.'s Mot."] at 15–16, ECF No. 38-1; Pl.'s Opp'n Def.'s Partial Mot. Dismiss ["Pl.'s Opp'n"] at 14, ECF No. 39). Accordingly, the Court applies New York law.

Rich alleges the fraud began, at the earliest, in 2012. (Am. Compl. ¶ 256–57). When analyzing William Penn's captive and affiliate reinsurance transactions, the New York Department of Financial Services reported that "greater conservatism is needed in the assumptions and methodology used for asset adequacy analysis." (Id. ¶ 257). According to Rich, this report put William Penn on notice that the guaranteed minimum interest rate on life insurance policies could not be achieved. Despite this knowledge, William Penn did not disclose any financial concerns in its Policy Statements or other communications to its policyholders. Because Rich brought suit in 2017—five years later—their fraud claim is not barred by the six-year statute of limitations.

Even if the fraud began earlier than 2012, Rich, under the facts of the Amended Complaint, could not have discovered the fraud until it received the COI Notification Letter. (Am. Compl. ¶¶ 283–87). Before the COI Notification Letter, William Penn's public statements all suggested that it was financially sound and that the Class Policies were stable. (Id. at ¶ 47). The increase in COI rates was the first alert to the policyholders that circumstances had changed. The fraud claim, therefore, did not accrue until 2015, and Rich brought the claim well within the six-year statute of limitations.

### 3. Source of Duty and Economic Loss Rules

New York courts have fashioned two rules to attempt to "keep contract law from drowning in a sea of tort": (1) the source of duty rule; and (2) the economic loss rule. Carmania Corp., N.V. v. Hambrecht Terrell Int'l, 705 F. Supp. 936, 938 (S.D.N.Y. 1989) (citations and internal quotation marks omitted).

Under the source of duty rule (also known as the <u>Clark-Fitzpatrick</u> rule), "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." <u>Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.</u>, 516 N.E. 2d 190, 193 (N.Y. 1987). The duty "must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." <u>Id.</u> at 194. This rule prevents the transformation of a breach-of-contract claim into a tort claim merely by phrasing the breach-of-contract claim in the language of tort law. <u>Id.</u> A plaintiff can, however, recover under both contract and tort theories "so long as a defendant violates distinct legal duties: one that arises from the contract at issue, and one that arises independently." <u>Carmania Corp.</u>, 705 F.Supp. at 938.

In cases involving a breach of contract claim and a fraud claim arising out of the same or similar facts, a plaintiff can recover on the fraud claim under New York law only if the plaintiff: (1) "demonstrate[s] a legal duty separate from the duty to perform under the contract"; (2) "demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract"; or (3) "seek[s] special damages that are caused by the misrepresentation and unrecoverable as contract damages." <u>In re Enron Corp.</u>, No. 04 Civ 1367, 2005 WL 356985, at *8 (S.D.N.Y. Feb. 15, 2005) (alterations in original) (quoting <u>Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.</u>, 98 F.3d 13, 20 (2d Cir. 1996)). Additionally, a plaintiff may recover under a fraudulent inducement claim in addition to breach of contract claims. <u>Id.</u> at *10 (collecting cases); <u>see N.Y. Univ. v. Cont'l Ins. Co.</u>, 87 N.Y. 2d 308, 316 (N.Y. 1995) ("Where a party has fraudulently

induced the plaintiff to enter into a contract, it may be liable in tort, or where a party engages in conduct outside the contract but intended to defeat the contract, its extraneous conduct may support an independent tort claim.").

Under the economic loss rule, parties are prevented "from improperly attempting to convert contract claims to tort claims seeking the same damages." Negrete v. Citibank, N.A., 187 F.Supp.3d 454, 472 (S.D.N.Y. 2016). This rule is premised on the different goals of contract and tort law damages. Breach of contract damages provide plaintiffs with "the benefit of the bargains they and the defendants chose to strike—i.e., to be placed in the positions they would have enjoyed had the parties' expectations panned out." Carmania Corp., 705 F.Supp. at 938. Tort damages, on the other hand, "deter people from inflicting harm when they behave unreasonably" and "compensate those injured by restoring them to the state they occupied before they suffered harm." Id. Consequently, New York law prevents recovery in tort for plaintiffs who have suffered only "'economic loss,' but not personal or property injury." Id.

Rich alleges William Penn made fraudulent misrepresentations and omissions: (1) in its COI Notification Letter to Rich and putative class members announcing the COI rate increase; (2) in its Policy Statements; (3) in its Corporate Reports and on its website. William Penn raises both rules as defenses to Count II of the Amended Complaint. The Court applies these doctrines to each of Rich's alleged misrepresentations and omissions in turn.

### a. COI Notification Letter

Rich cites the COI Notification Letter as an example of a fraudulent statement, contending William Penn misstated the reason for the COI rate increase. The terms of the Class Policies governed William Penn's COI rate increases. (Class Policies at 11). The terms provide the only limitations on William Penn's ability to change the COI rate; William Penn has no duty under tort law to refrain from raising the COI rate for any particular reason. This Court reached the same conclusion in <u>Dickman</u>. 2016 WL 7383869, at *11. In <u>Dickman</u>, the plaintiffs cited letters informing them of the increase as another example of a fraudulent statement on which they relied to their detriment. <u>Id.</u> In explaining that the <u>Dickman</u> plaintiffs' claim for fraud would be limited in scope, this Court stated, "Whether the COI increase was improper . . . is a matter of contract, not tort." <u>Id.</u> Further, the damages sought in connection with the misrepresentations in the COI Notification Letter would be no different than the damages Rich seeks for the breach of contract claim. Thus, the claim of fraud for the COI Notification Letter is barred by both the source of duty and economic loss rules.

### b. Policy Statements

Rich also alleges the Policy Statements William Penn sent to policyholders fraudulently misrepresented William Penn's financial condition. William Penn's obligations regarding the Policy Statements stem from the Class Policies' terms. The Class Policies created William Penn's duty to send out Policy Statements and governed the information to be included in the Policy Statements. (Class Policies at 11). The Class Policies did not specifically state, however, that the required information in the Policy

Statements be "accurate." William Penn, therefore, plausibly had a separate tort duty to avoid misrepresenting information in its Policy Statements. Cf. Negrete, 187 F.Supp.3d at 471 (rejecting plaintiffs' theory that defendant breached the duty "to provide [p]laintiffs with accurate information" because the duty did not arise separately from the contract itself where defendant had a contractual duty to "monitor the value of [p]laintiffs' accounts accurately" (emphasis added)). Accordingly, this portion of Rich's fraud claim is not barred by the source of duty rule.

With regard to the economic loss rule, Rich is seeking different damages for this fraud claim than for the Trust's breach-of-contract claim. The fraud claim damages were incurred prior to the breach-of-contract damages because Rich alleges that he and the putative class members would have stopped paying premiums and excess premiums and sought alternative life insurance earlier had they known William Penn's true financial situation. By contrast, the breach-of-contract damages were not incurred until after William Penn breached the contract, which occurred when Rich and the putative class members received the COI Notification Letter. Temporal distinctions such as these can be relevant to deciding whether alleged losses can support independent breach-of-contract and fraud claims. See In re Lincoln Nat'l COI Litig., 269 F.Supp.3d 622, 645 (E.D.Pa. 2017). In In re Lincoln National, the court concluded that the plaintiffs had "adequately alleged independent losses" where the breach-of-contract claims "rest[ed] on payments after increase," in comparison to payments made before the increase based on misrepresentations. Id. The same distinction can be drawn in this case. The Court,

therefore, concludes that the economic loss rule does not bar this portion of Rich's fraud claim.

### c.    Corporate Reports and Website

Rich alleges William Penn's Corporate Reports and website contained fraudulent misrepresentations and omissions regarding its financial stability. Unlike William Penn's obligations surrounding the COI rate and the Policy Statements, the Class Policies did not contain provisions governing William Penn's responsibilities as to its Corporate Reports or website.

In Dickman, this Court concluded that the source of duty and economic loss rules did not bar similar claims. 2016 WL 7383869, at *9–10. The Dickman plaintiffs cited the defendant life insurance company's financial statements as an example of fraudulent misrepresentations, claiming the company misrepresented itself as financially stable. Id. at *10. This Court concluded that the claim was analogous to a fraud-in-the-inducement claim, thereby excepting the claim from the source of duty and economic loss rules. This Court wrote:

> Plaintiffs' fraud claim is certainly not a 'fraud in the inducement' claim in the typical sense in that the alleged false statements were made well after Plaintiffs initially purchased their insurance policies. An inference can be made, however, that the positive financial statements, which Plaintiffs allege were known to be false when made, were made to induce Plaintiffs to continue to submit their excess premium payments when they would not have if they knew the true performance of the policies. The court finds these allegations sufficiently akin to a fraud in the inducement claim to permit Plaintiffs' fraud claims to escape the bar of the economic loss rule, at least at this stage of the proceedings.

19

Id. (applying Virginia law).

Although this Court applied Virginia law in the <u>Dickman</u> case, the reasoning applies with equal force to this case because New York law has a similar exception for fraud-in-the-inducement claims. <u>See</u> <u>In re Enron Corp.</u>, 2005 WL 356985, at *10. Similar to the <u>Dickman</u> plaintiffs, Rich alleges that the false statements in William Penn's Corporate Reports and website were made to induce Rich and the putative class members to continue to submit their premiums and excess premiums, and Rich and the putative class members would have ceased making these payments if they had known the true status of William Penn's finances. Thus, because Rich's fraud claim with respect to the Corporate Reports and website is analogous to a fraud-in-the-inducement claim, it is not barred by the source of duty and economic loss rules.

Further, like the Policy Statements, Rich's alleged damages for this portion of the fraud claim differ from its alleged damages for its breach of contract claim. The same temporal distinction exists with the Corporate Reports and website as it does with the Policy Statements. <u>See</u> <u>In re Lincoln Nat'l COI Litig.</u>, 269 F.Supp.3d at 645. Thus, Rich's fraud claim related to the Corporate Report and website escapes the bar of the economic loss rule.

### 4. Fraud Claim

To state a fraud claim under New York law, a plaintiff must allege that: (1) "the defendant made a material false representation"; (2) "the defendant intended to defraud the plaintiff thereby"; (3) "the plaintiff reasonably relied on the representation"; and (4) "the plaintiff suffered damage as a result of such reliance." <u>Newman v. Family Mgmt.</u>

Corp., 530 F.App'x 21, 24 (2d Cir. 2013) (citing Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 186–87 (2d Cir. 2004)). Additionally, a fraud claim implicates the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which requires a plaintiff to plead "with particularity the circumstances constituting fraud." The plaintiff must specifically allege "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Spaulding v. Wells Fargo Bank, N.A., 714 F.3d 769, 781 (4th Cir. 2013).

### a.    Material False Representation

Rich pleads with particularity fraudulent misrepresentations and omissions William Penn made to Rich and the putative class members in William Penn's Policy Statements, Corporate Reports, and website. Specifically, Rich alleges, "William Penn falsely represented to [Rich] and Class Members, by and through its website and corporate Annual Reports that William Penn was a well-funded company, operating efficiently, increasing profits and cash flows, and reducing costs." (Am. Compl. ¶ 279). The Court addresses the specific material false representations below.

### i.    Policy Statements

The Amended Complaint alleges that William Penn sends its policyholders Policy Statements on each yearly anniversary. (Id. ¶ 44). These Policy Statements contain: "(a) the payments [policyholders] have made, (b) the monthly expenses and cost of insurance deductions, (c) what interest has been credited to the policy's cash value, and (d) the rate at which interest has been credited." (Id. ¶ 45). Rich alleges that the Policy Statements

misrepresented the performance of the policies by stating that "the policies were performing as they had been marketed." (Id. ¶ 46). Additionally, Rich pleads that the Policy Statements fraudulently omitted any information suggesting that "the policies' 'experience' was failing to meet William Penn's original expectations" or that the COI charges would "dramatically increase." (Id. ¶ 47). These allegations are particular and adequately allege William Penn's material false representations in its Policy Statements.

### ii.    Corporate Reports

The Amended Complaint alleges that William Penn prepares and files its Corporate Reports yearly with the Maryland Department of Insurance and the New York Department of Financial Services. (Id. ¶ 100). Rich further alleges that the Corporate Reports, along with "every public representation" by William Penn, "indicated that the companies were performing strongly, reducing costs, and outperforming the market." (Id. ¶ 47). These allegations satisfy the particularity requirement and distinguish Rich's fraud claim from claims that have been dismissed by other courts for lack of detail. See, e.g., Sanchez v. ASA Coll., Inc., No. 14-CV-5006, 2015 WL 3540836, at *11 (S.D.N.Y. June 5, 2015) (dismissing fraud claim for lack of particularity where "[the complaint] include[d] virtually no details as to when and where [the allegedly fraudulent] materials were disseminated").

### iii.    Website

The Amended Complaint also alleges that William Penn makes fraudulent misrepresentations and omissions about its financial health on its website. The Amended Complaint cites to a webpage entitled "Financial Strength" and alleges that the page

"brags about [William Penn's] financial standing based on ratings of LGA." (Id. ¶ 88). The website also states, "Legal & General America is financially strong, fiscally responsible and committed to the business practices that will allow us to keep our promises to you." (Id. ¶ 87). Although the website discussed in the Amended Complaint appears to belong to LGA, the Amended Complaint alleges that the website references William Penn throughout. (Id. ¶ 88 n.3). At this stage of the proceedings, these allegations are sufficient to meet the heightened pleading standard. Discovery appears to be necessary to determine whether William Penn is in fact the speaker of these statements and whether the statements are sufficiently specific to be actionable.

### b.    Intent to Defraud

The Amended Complaint properly alleges William Penn knew the relevant statements were false and intended to defraud Rich and the putative class members by making the statements and omissions. (Id. ¶¶ 281–83, 288). Thus, Rich sufficiently alleges this element.

### c.    Reasonable Reliance

Showing a claim for fraud requires the plaintiff show both actual and reasonable or justifiable reliance on the alleged fraudulent statements. KNK Enters., Inc. v. Harriman Enters., Inc., 824 N.Y.S.2d 307, 307 (N.Y.App.Div. 2006). Reliance is not reasonable or justifiable where a party "could have discovered the truth with due diligence." Id. Generally, whether reliance is reasonable is not "a question to be resolved as a matter of law on a motion to dismiss." ACA Fin. Guar. Corp. v. Goldman, Sachs & Co., 32 N.E. 3d 921, 922–23 (N.Y. 2015). There are some instances, however,

where reasonable reliance can be determined as a matter of law. Terra Sec. ASA Konkursbo v. Citigroup, Inc., 820 F.Supp.2d 541, 545 (S.D.N.Y. 2011). In making this determination, the court can consider "the entire context of the transaction, including . . . the sophistication of the parties, and the content of any agreements between them." Id. (citing Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003)).

Here, Rich alleges that he and the putative class members actually and reasonably relied on William Penn's purportedly fraudulent statements and omissions. (Am. Compl. ¶¶ 289–91). Rich emphasizes that a life insurance company's financial condition is particularly important to policyholders because "life insurance companies promise to pay death benefits far into the future." (Id. ¶ 87). Policyholders, therefore, rely on life insurance companies' public statements, such as those William Penn made in the Corporate Reports and website, in making decisions to purchase life insurance, keep life insurance, and pay excess premiums. The Corporate Reports are particularly important because they are among "the few publicly available financial disclosure documents." (Id. ¶ 106). The Amended Complaint explains, "Consumers, agents, ratings agencies, and others rely on the [Corporate Reports] to assess companies' financial strength and ability to pay future claims as they come due. In short, [the Corporate Reports] are essential for the ultimate consumer—the policyholder—to evaluate whether to put his or her trust in the insurance company." (Id.). Because William Penn's Corporate Reports and other public statements are so important, Rich alleges that the Trust and the putative class members relied on those statements and were entitled to rely on those statements in

continuing to pay premiums and excess premiums and not seeking alternative life insurance coverage. (Id. ¶ 289). Rich also alleges that the Trust and the putative class members reasonably relied on the Policy Statements in continuing to pay premiums. (Id. ¶ 46).

Nevertheless, William Penn argues that Rich has failed to allege reasonable reliance because Rich makes inconsistent arguments. According to William Penn,

> Plaintiff seems to argue that it was sophisticated enough to analyze the Annual Reports and come to the subjective conclusion that William Penn was financially healthy—so healthy, in fact, that plaintiff need not worry that William Penn might later try to raise COI to recoup prior losses—but that plaintiff was not sophisticated enough to determine that William Penn was actually not financially healthy and had instead used a captive reinsurance scheme to make it look healthier than it actually was.

(Def.'s Reply at 18, ECF No. 42). William Penn emphasizes that information about the reinsurance transactions was included in William Penn's Corporate Reports. As a result, William Penn argues, Rich could not reasonably rely on other statements in the Corporate Reports to conclude William Penn was financially stable. The Court disagrees.

In JP Morgan Chase Bank v. Winnick, when faced with similar arguments, the court declined to hold that the plaintiff's reliance on the defendant's financial statements was unreasonable as a matter of law, even though some information that called into question the financial stability of the defendant was publicly available. 350 F.Supp.2d 393, 408–10 (S.D.N.Y. 2004). The court explained,

> [Defendants' financial statements] showed healthy revenues; discovering the falsity of those claims would have required an inquiry into the quality of the revenue reported. While it is

> true that the company's public financials had prompted some
> analysts to raise these very questions, the Court cannot say
> that the reports themselves should necessarily have generated
> sufficient doubt on the part of [plaintiff] to trigger a duty to
> inquire as a matter of law.

Id. at 409–10.

Here, the Amended Complaint similarly alleges that the Corporate Reports did not include enough details about the reinsurance transactions to conclude there was reason for concern over William Penn's financial security. (Am. Compl. ¶¶ 225, 228). Further, the Amended Complaint states that much of the information about the reinsurance transactions was not publicly available. (Id. ¶ 225). These allegations are sufficient to allege reasonable reliance and a plausible claim for fraud. See JP Morgan Chase Bank, 350 F.Supp.2d at 408–410.

### d. Damages

Rich alleges that the Trust and the putative class members suffered damages from their reliance by continuing to pay premiums and excess premiums and not attempting to obtain alternative life insurance policies. (Id. at ¶¶ 289–92). Rich, therefore, adequately alleges the damages element of a fraud claim.

In sum, the Court concludes that the economic loss and source of duty rules bar Rich's fraud claim related to the COI Notification Letter. The Court further concludes that Rich plausibly states a fraud claim related to William Penn's Policy Statements, Corporate Reports, and website. Accordingly, the Court will grant in part and deny in part William Penn's Motion.

### III. CONCLUSION

For the foregoing reasons, William Penn's Partial Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 38) is granted in part and denied in part. William Penn's Motion is granted as to the fraud claim regarding the COI Notification Letter, but denied as to the Policy Statements, Corporate Reports, and website. The Court will deny William Penn's Motion to Dismiss (ECF No. 30) as moot. A separate order follows.


Entered this 25th day of September, 2018

_____/s/_____
George L. Russell, III
United States District Judge